# United States Court of Appeals
## For the First Circuit

No. 21-1676

KAREN MORALES POSADA; AMANDA SARMENTO FERREIRA GUIMARAES;
WILLIANA ROCHA; SARA BARRIENTOS, individually and on behalf of
all others similarly situated,

Plaintiffs, Appellees,

v.

CULTURAL CARE, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before
Barron, Chief Judge,
Lipez and Howard, Circuit Judges.

Kathleen M. Sullivan, with whom William B. Adams, Harvey J.
Wolkoff, Alex H. Loomis, Gavin S. Frisch, and Quinn Emanuel
Urquhart & Sullivan, LLP, were on brief, for appellant.

David H. Seligman, with whom Towards Justice, Peter Rukin,
Rukin Hyland & Riggin LLP, Matthew C. Helland, and Nichols Kaster,
LLP, were on brief, for appellees.

Brian M. Boynton, Principal Deputy Assistant Attorney
General, Civil Division, Department of Justice, Michael S. Raab,
Appellate Staff, Civil Division, Department of Justice, Gerard
Sinzdak, Appellate Staff, Civil Division, Department of Justice,
Rachael S. Rollins, United States Attorney, and Richard C. Visek,
Acting Legal Advisor, U.S. Department of State, on brief for amicus

curiae United States.

Ira J. Kurzban, Helena M. Tetzeli, Edward F. Ramos, Elizabeth Montano, Kurzban Kurzban Tetzeli & Pratt P.A., on brief for amicus curiae Alliance for International Exchange.

Dawn L. Smalls, Ann O'Leary, Illyana A. Green, and Jenner & Block LLP, on brief for amici curiae National Domestic Workers Alliance, National Employment Law Project, and Economic Policy Institute.

———————————

April 26, 2023

———————————

**BARRON, Chief Judge**.  This appeal concerns Yearsley v. W.A. Ross Construction Company, in which the Supreme Court of the United States held that "there is no ground for holding [an] agent [of the Government] liable" for actions "authorized and directed" by the Government and taken "under" Government "authority" that has been "validly conferred."  309 U.S. 18, 20-22 (1940).  The appellant, Cultural Care, Inc. ("Cultural Care"), a Massachusetts-based company, claims that Yearsley not only protects it from being held liable in the suit that underlies this appeal but also that Yearsley makes it immune from the suit altogether.

In pressing this contention, Cultural Care takes aim at the District Court for the District of Massachusetts's order denying its Yearsley-based motion to dismiss the plaintiffs-appellees' claims against it.  Cultural Care contends that, even though the appeal from that order is interlocutory, we have appellate jurisdiction under the collateral order doctrine to review the order's rejection of the claim of immunity under Yearsley.  Cultural Care goes on to contend that we also have appellate jurisdiction under the doctrine of pendent appellate jurisdiction over the remainder of its interlocutory appeal of the order, in which Cultural Care challenges the order's rejection of the portions of the motion to dismiss that were based on grounds independent of the claim of immunity under Yearsley.  Finally,

- 3 -

Cultural Care contends that the order must be reversed, insofar as the order rejected both Cultural Care's bid for immunity based on Yearsley and the other grounds for dismissing the plaintiffs-appellees' claims that Cultural Care is pressing in this appeal.

We conclude that Cultural Care has not shown that it is entitled to the immunity that it claims under Yearsley. We thus affirm the order in that respect, although we do so for reasons distinct from those on which the order relied. We also decline to exercise our discretion under the doctrine of pendent appellate jurisdiction to review the remaining portions of Cultural Care's appeal. We thus dismiss them for lack of appellate jurisdiction.

**I.**

The appellees are the four named plaintiffs in the underlying suit: Karen Morales Posada, Amanda Sarmento Ferreira Guimaraes, William Rocha, and Sara Barrientos. They filed suit in October 2020 on behalf of themselves and others in their asserted class in the United States District Court for the District of Massachusetts. The operative complaint names the defendant as Cultural Care, which is a private company that places foreign nationals as au pairs with host families throughout the United States.

The complaint alleges that Cultural Care placed the plaintiffs-appellees -- named and unnamed -- as au pairs with host families in various states while acting as the U.S. Department of

- 4 -

State ("DOS")-designated "sponsor[]" of the "exchange visitor program" for au pairs through which the plaintiffs-appellees were granted the special visas that permitted them to come to this country and participate in that program.[1] See 8 U.S.C. § 1101(a)(15)(J); 22 C.F.R. § 62.2. The complaint further alleges that Cultural Care, while acting as the "sponsor," violated the plaintiffs-appellees' rights under the Fair Labor Standards Act ("FLSA"), various state wage and overtime laws, and various state deceptive trade practices laws.

The complaint alleges more specifically that Cultural Care qualified as an "employer" of the plaintiffs-appellees under the relevant states' wage-and-hour laws and not only failed to pay the plaintiffs-appellees what they were owed as "employees" under those laws, but also failed to provide the plaintiffs-appellees from California and New York with the wage statements required by those two states' wage-and-hour laws. The complaint further alleges that Cultural Care violated the FLSA "when it failed to pay" the plaintiffs-appellees that it "employ[ed]" the minimum wage "required by the FLSA" and the "required overtime [pay] for their work." See 29 U.S.C. §§ 206, 207, 216(b). Finally, the complaint alleges that Cultural Care engaged in an "unlawful,

---

[1] For a more detailed description of the relevant regulatory scheme, see Capron v. Office of Attorney General of Massachusetts, 944 F.3d 9, 13-18 (1st Cir. 2019).

- 5 -

unfair, or fraudulent business act or practice" in violation of California law, see Cal. Bus. & Prof. Code § 17200 et seq., and engaged in "deceptive trade practices under the consumer protection laws of" New York, New Jersey, Illinois, Connecticut, and Washington, by issuing "materially misleading" instructions to "au pairs and host families that au pair wages should be a minimum of $195.75 per week." The complaint requests, among other forms of relief, monetary damages and an order requiring Cultural Care to "immediately cease its wrongful conduct."

Cultural Care filed a motion to dismiss the complaint in March of 2021. The motion contended that the complaint must be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) because Cultural Care is "shielded from the entirety of this suit under the doctrine of derivative sovereign immunity" set forth in Yearsley. The motion contended in that regard that Yearsley's so-called "derivative sovereign immunity" "protects private entities from suits based on conduct authorized and directed by the United States" and that Cultural Care's allegedly unlawful conduct was of that kind.

The motion separately argued that the state law wage-and-hour and deceptive trade practices claims had to be dismissed for failure to state a claim on which relief could be granted because the claims were preempted by the DOS regulations pursuant to which Cultural Care was designated as the "sponsor" of the

- 6 -

"exchange visitor program" for au pairs that is at issue.  See 22 C.F.R. § 62.2.  The motion also sought the dismissal of the FLSA claims and the various state law wage-and-hour claims for failure to state a claim upon which relief could be granted because those claims failed plausibly to allege that Cultural Care, in its role as "sponsor" of the "exchange visitor program," was acting as the plaintiffs-appellees' "employer."  Finally, the motion sought the dismissal of the state law deceptive trade practices claims for failure to state a claim upon which relief could be granted.  The motion contended in this regard that the complaint's allegations were "vague[]," did not "identify a single relevant statute or common law rule," and could not succeed "[i]n any event" because the allegedly deceptive dissemination of information was fully compliant with DOS regulations and guidance documents.[2]

In August of 2021, the District Court granted Cultural Care's motion in part and denied it in part.  See Morales Posada v. Cultural Care, Inc., 554 F. Supp. 3d 309, 324 (D. Mass. 2021). The District Court granted Cultural Care's motion to dismiss the state law deceptive trade practices claims under Connecticut and

_____

[2]  Insofar as this last assertion is distinct from Cultural Care's Yearsley-based claim, the District Court did not address it and Cultural Care does not raise it on appeal. See Morales Posada v. Cultural Care, Inc., 554 F. Supp. 3d 309 (D. Mass. 2021).

Washington law for lack of standing under the laws of those states, but otherwise denied the motion.  See id.

The District Court ruled in denying the motion that there was no basis for dismissing all the claims for lack of subject matter jurisdiction based on Yearsley.  The District Court did so because it determined that Cultural Care, as "sponsor" of the "exchange visitor program" at issue, was more akin to a private bank that had been licensed to operate by the Government than the Government contractor involved in Yearsley itself.  Id. at 318-19.

The District Court ruled that the motion also must be denied insofar as it sought the dismissal on preemption grounds of the plaintiffs-appellees' state law wage-and-hour and deceptive trade practices claims.  Id. at 319, 322-23.  The District Court determined in this regard that those claims were not preempted. Id.

The District Court further denied the motion insofar as it sought dismissal of the wage-and-hour claims -- seemingly both state and federal -- based on plaintiffs-appellees' purported failure to allege plausibly that Cultural Care was acting as an "employer" in its role as "sponsor" of the "exchange visitor program."  Id. at 322-23.  The District Court did so because it ruled that the plaintiffs-appellees had plausibly alleged that Cultural Care was their "employer."  Id.

Finally, the District Court denied the motion insofar as the motion sought the dismissal on vagueness grounds of the plaintiffs-appellees' state law deceptive trade practices claims. Id. at 323. The District Court based that ruling on the ground that those claims were sufficiently "specific." Id.

Cultural Care thereafter filed this interlocutory appeal to challenge the District Court's denial of the motion to dismiss. The District Court stayed the litigation at the parties' request pending our resolution of the appeal. Meanwhile, the plaintiffs-appellees filed in this Court a motion for summary disposition pursuant to Local Rule 27.0(c).

The motion asserted that Cultural Care had no "plausible basis to assert" Yearsley protection, thus warranting our summary disposition of the appeal. The motion further asserted that, even if Cultural Care did have a "plausible basis to assert" Yearsley protection, the nature of the protection that Yearsley provides to those entitled to it is not an immunity from suit. As a result, the motion asserted that "this appeal would still not be proper because the Court lacks appellate jurisdiction to hear an appeal of the District Court's denial of Cultural Care's motion to dismiss."

A separate panel of this Court denied the motion. See Order, Morales Posada v. Cultural Care, Inc., No. 21-1676 (1st

Cir. Nov. 1, 2021).  It did so without prejudice to our reconsideration of it.  Id.

After this Court heard oral arguments by the parties, we issued an order on August 29, 2022, "solicit[ing] the views of the United States Department of State in an amicus curiae brief" on the issues presented in this appeal.  The United States asserts in its brief that Yearsley is "merely a defense to liability," and that the rejection by a district court of such a defense "can be reviewed effectively following a final judgment and typically involves the resolution of issues that are intertwined with the merits," such that the collateral order doctrine does not apply.  Thereafter, Cultural Care sought leave to file a supplemental responsive brief, which we granted on December 9, 2022, while also allowing a supplemental response by plaintiffs-appellees.[3]

## II.

We usually lack appellate jurisdiction over appeals of orders that deny motions to dismiss because such orders are not "final" under 28 U.S.C. § 1291.  See Whitfield v. Mun. of Fajardo, 564 F.3d 40, 45 (1st Cir. 2009).  Cultural Care contends that we have such jurisdiction here, however, due to the combined effect in this case of the collateral order doctrine, which often permits us to hear interlocutory appeals from orders that deny motions to

---

[3] We appreciate the contributions of the additional amici who submitted briefs in this case.

- 10 -

dismiss that are based on claims to immunity from suit, see Digit. Equip. Corp. v. Desktop Direct, Inc., 511 U.S. 863, 871-72 (1994), and the doctrine of pendent appellate jurisdiction, which permits us to resolve on interlocutory appeal issues that are "inextricably intertwined" with issues over which we otherwise have appellate jurisdiction, see Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 51 (1995).

Cultural Care relies on the collateral order doctrine to argue that we have appellate jurisdiction over the portion of its appeal that challenges the District Court's rejection of its claim of immunity from this suit under Yearsley. It relies on the doctrine of pendent appellate jurisdiction to argue that we have appellate jurisdiction over the portions of its appeal that challenge the District Court's rejection of its contentions that the plaintiffs-appellees failed to allege plausibly that Cultural Care is an "employer" under the FLSA and that the DOS regulations that implement the "exchange visitor program" for au pairs preempt the plaintiffs-appellees' state law claims.

We begin with Cultural Care's arguments that concern the collateral order doctrine. We then address its arguments that concern the doctrine of pendent appellate jurisdiction.

**A.**

Cultural Care emphasizes that orders denying motions to dismiss that are based on a claimed immunity from suit often

- 11 -

satisfy the requirements of the collateral order doctrine, which permits us to exercise appellate jurisdiction over appeals from orders that are not otherwise "final" under 28 U.S.C. § 1291. Cultural Care contends that is so because such orders "(1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) [are] effectively unreviewable on appeal from a final judgment." Will v. Hallock, 546 U.S. 345, 349-50 (2006) (internal citation omitted); see Digit. Equip. Corp., 511 U.S. at 871 (finding that orders denying motions to dismiss based on claims to immunity from suit "are strong candidates for prompt appeal" under the collateral order doctrine); Wyatt v. Cole, 504 U.S. 158, 166 (1992) (noting that immunities may be "effectively lost if a case is erroneously permitted to go to trial" (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985))). Cultural Care further contends that the District Court's order denying Cultural Care's motion to dismiss, in rejecting the Yearsley-based claim of immunity, has these three features.[4] Thus, Cultural Care argues, we have jurisdiction under the collateral order doctrine over the Yearsley-based portion of this appeal.

---

[4] We do not understand Cultural Care to contend that, if Yearsley does not confer an immunity from suit and instead confers only a defense to liability, an order denying protection under Yearsley might still be reviewable on appeal under the collateral order doctrine.

The plaintiffs-appellees, joined by the United States as amicus at our invitation, do not dispute that if Cultural Care can show that it is entitled to Yearsley protection and that Yearsley confers an immunity from suit over those entitled to its protection, then we have appellate jurisdiction under the collateral order doctrine over the Yearsley-based portion of this appeal. But, the plaintiffs-appellees and the United States contend, Cultural Care cannot make that showing.

The plaintiffs-appellees and the United States argue in that regard that, contrary to Cultural Care's contentions, Yearsley does not confer a derivative form of the United States' own sovereign immunity, which we have held to be an immunity from suit. See Villanueva v. United States, 662 F.3d 124, 126 (1st Cir. 2011) ("[S]overeign immunity (which is jurisdictional in nature) shields the United States from suit."). Rather, the plaintiffs-appellees and the United States argue, Yearsley merely recognizes a defense to liability that certain private parties may assert in consequence of their having acted on the Government's behalf. The plaintiffs-appellees and the United States thus contend that the District Court's order denying Cultural Care's Yearsley-based motion to dismiss is effectively reviewable on appeal from a final judgment, as denials of defenses to liability usually are. See Acevedo-Garcia v. Vera-Monroig, 204 F.3d 1, 14 (1st Cir. 2000) (finding that a municipality's defenses to a §

- 13 -

1983 lawsuit were not appealable under the collateral order doctrine because they did not implicate "a right to immunity from trial" but were merely "defense[s] to liability" (internal citation omitted)).  And so, the plaintiffs-appellees and the United States argue, the order before us is for that reason alone not an order from which, pursuant to the collateral order doctrine, the Yearsley-based portion of this appeal may be taken.

The plaintiffs-appellees (though not the United States) do not stop there, however.  They go on to assert that Cultural Care is not entitled to any protection under Yearsley, regardless of the kind of protection that Yearsley confers on those entitled to it.

The plaintiffs-appellees first contend that is so because Cultural Care has not shown that it has the kind of tie to the Government that would entitle it to the protection that Yearsley recognizes.  The plaintiffs-appellees emphasize in that regard that Cultural Care makes no case that, in acting as the DOS-designated "sponsor" of the "exchange visitor program" for au pairs in which the plaintiffs-appellees were participants, Cultural Care had either a contractual or common-law agency relationship with the Government.

But, the plaintiffs-appellees also argue that, in any event, Cultural Care cannot show that it is entitled to any protection under Yearsley for another reason.  Here, they contend

that Cultural Care has failed to show that the claims that it seeks to dismiss aim to hold it liable for actions that the Government "authorized and directed."  See Yearsley, 309 U.S. at 20.

**B.**

The parties do not clearly explain how all their arguments about whether Cultural Care is entitled to immunity under Yearsley bear on all their arguments about whether the District Court's order denying Cultural Care's Yearsley-based motion to dismiss satisfies the collateral order doctrine.  Nor do the parties address whether Cultural Care has advanced a "substantial claim" of immunity, compare McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1338-41 (11th Cir. 2007) (finding that plaintiffs had presented a substantial claim of immunity under Yearsley), with Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc., 481 F.3d 265, 268-69 (5th Cir. 2007) (finding that plaintiffs had not presented a substantial claim of immunity under Yearsley), and whether, if so, we have appellate jurisdiction under the collateral order doctrine over the Yearsley-based portion of this appeal regardless of whether the claim of Yearsley protection is ultimately meritorious, see McMahon, 502 F.3d at 1339 & n.6 ("A substantial claim to immunity from suit, not immunity itself, is the basis for a collateral order appeal."); see also Mitchell, 472 U.S. at 525 ("[T]he denial of a substantial claim of absolute immunity is an order appealable before final judgment . . . .");

Fisichelli v. City Known as Town of Methuen, 884 F.2d 17, 18 (1st Cir. 1989) ("[T]he denial of a substantial claim to qualified immunity can be immediately appealed under [the collateral order] exception.").

As a result, the parties do not address how the fact that it is an open question in our Circuit whether Yearsley confers an immunity from suit rather than merely a defense to liability bears on whether we have appellate jurisdiction under the collateral order doctrine over the Yearsley-based portion of Cultural Care's appeal.[5] Nor do the parties address whether, if

---

[5] There is no consensus among our sister circuits as to whether Yearsley confers an immunity from suit, the denial of which is appealable under the collateral order doctrine. Compare, e.g., Childs v. San Diego Family Hous. LLC, 22 F.4th 1092, 1099 (9th Cir. 2022) (finding that Yearsley protection is not an immunity from suit appealable under the collateral order doctrine), with Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 650-51 (4th Cir. 2018) (finding that "the Yearsley doctrine" confers an immunity "from suit"), In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 192, 196 (2d Cir. 2008) (finding that Boyle v. United Techs. Corp., 487 U.S. 500 (1988), "refined" the protection granted in Yearsley and that a court may exercise collateral order jurisdiction over an appeal of a lower court's denial of a private actor's claim of Boyle protection as applied in the Stafford Act context), McMahon, 502 F.3d at 1339 (exercising collateral order jurisdiction over a denial of a substantial claim of protection under Feres v. United States, 340 U.S. 135 (1950), as applied to a private actor under Yearsley), and Adkisson v. Jacobs Eng'g Grp., Inc., 790 F.3d 641, 647 (6th Cir. 2015) (citing Filarsky v. Delia, 566 U.S. 377, 388-94 (2012), in holding that "Yearsley immunity is, in our opinion, closer in nature to qualified immunity for private individuals under government contract" than it is to sovereign immunity). But cf. Al Shimari

- 16 -

we were to reject Cultural Care's claim of immunity solely on the ground that Cultural Care is not entitled to any protection under <u>Yearsley</u> at all, we would be required under the collateral order doctrine to dismiss the appeal for lack of appellate jurisdiction on the ground that no "substantial claim" of immunity had been made or to affirm the order of the District Court in that regard as an exercise of such jurisdiction. See <u>Houston Cmty. Hosp.</u>, 481 F.3d at 268-69.

As it happens, though, we cannot dispose of this appeal without at least addressing the claim of immunity that Cultural Care makes, if only to determine whether that claim is "substantial." And, we do not understand the collateral order doctrine to require us, in the course of doing so, to address whether <u>Yearsley</u> confers an immunity at all before addressing the more case-specific question of whether Cultural Care is entitled to any protection under <u>Yearsley</u>. Moreover, if, after undertaking that latter inquiry, we were to conclude that Cultural Care was not entitled to any such protection, that conclusion would be

---

v. <u>CACI Premier Tech., Inc.</u>, 775 F. App'x 758, 760 (4th Cir. 2019) ("[W]e have never held . . . that a denial of . . . [<u>Yearsley</u> protection] is immediately reviewable on interlocutory appeal."). See also <u>Murray</u> v. <u>Northrop Grumman Info. Tech., Inc.</u>, 444 F.3d 169, 175-76 (2d Cir. 2006) (finding that a private contractor "hired to perform a quintessential governmental function" may be entitled to "absolute[] immun[ity] from state tort liability for claims resulting from" actions taken "in the course of its official duties" under <u>Westfall</u> v. <u>Erwin</u>, 484 U.S. 292 (1988)).

- 17 -

binding on the District Court regardless of whether we then would be required to dismiss the Yearsley-based portion of the appeal for lack of appellate jurisdiction or affirm the District Court's order as the culmination of our exercise of such jurisdiction.

Thus, we conclude that we may bypass the fine point of what constitutes a "substantial claim" of immunity in this context. We similarly conclude that we may bypass the equally fine question of whether a claim of immunity of that "substantial" sort could suffice to secure our appellate jurisdiction under the collateral order doctrine even if the claim were ultimately rejected.[6] For, as we will explain, we conclude that Cultural Care's challenge to the order of dismissal would fail even if we were to assume that we did have appellate jurisdiction solely because a "substantial claim" of immunity had been made.

We reach this ultimate conclusion regarding Cultural Care's Yearsley-based claim of immunity, moreover, because we conclude that Cultural Care has not shown that it is entitled to

---

[6] See Norton v. Matthews, 427 U.S. 524, 531-32 (1976); Cowels v. Fed. Bureau of Investigation, 936 F.3d 62, 67 (1st Cir. 2019) ("Where a question of statutory jurisdiction is complex, but the merits of the appeal are 'easily resolved against the party invoking [] jurisdiction,' we can assume jurisdiction for purposes of deciding the appeal." (alteration in original) (quoting In re Fin. Oversight & Mgmt. Bd. for P.R., 916 F.3d 98, 114 n.13 (1st Cir. 2019))); Aves v. Shah, No. 96-3063, 1997 WL 589177, at *1 (10th Cir. 1997) (assuming jurisdiction under § 1291 "where the jurisdictional issues are difficult and the merits clearly and obviously run against the party seeking jurisdiction").

any protection under Yearsley at all. And that is because we conclude that, whether or not the plaintiffs-appellees are right that private parties must have contractual or common-law agency relationships with the Government to be entitled to protection under Yearsley, the plaintiffs-appellees are right that Cultural Care has not shown that the Government "authorized and directed" it to take the actions for which the claims that are at issue in this appeal seek to hold it liable.

To explain our reasoning in coming to this conclusion, we first review what Yearsley establishes about why the private party in that case enjoyed the protection that Yearsley recognized. We then explain how other courts have understood what Yearsley establishes with respect to when a private party is entitled to such protection. Finally, we explain why we conclude that Cultural Care has not shown that it is entitled to Yearsley's protection, first with respect to the plaintiffs-appellees' federal and state wage-and-hour claims and then with respect to the plaintiffs-appellees' deceptive trade practices claims.

## C.

Yearsley addressed whether a private company that the Government had contracted to construct dikes in the Missouri River was liable for the damage that construction caused to adjacent landowners by allegedly "produc[ing] artificial erosion" that "had washed away a part of" the landowners' land. 309 U.S. at 19. The

- 19 -

Court explained that the private company had asserted as a defense that "the work" that allegedly was unlawful -- and thus gave rise to liability -- "was done pursuant to a contract with the United States Government, and under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States, for the purpose of improving the navigation of the Missouri River, as authorized by an Act of Congress."  Id.

In assessing the merits of this asserted defense, the Court recounted that the court of appeals had found that "[t]here was evidence tending to show" that, to keep open a passage in the river that would be adequate for navigation while constructing the dike opposite the plaintiffs' land, the private company had accelerated the erosion of the plaintiffs' land "by using the paddle wheels of its steamboats to increase the action of the current."  Id. at 20 (internal quotations omitted).  But, the Court explained, the court of appeals also had found that "there was no evidence . . . that this 'paddle washing' had done 'anything more than hasten the inevitable.'"  Id.

Moreover, the Court noted that the court of appeals had found it to be "undisputed 'that the work which the contractor had done'" for which plaintiffs were seeking to hold the contractor liable -- in particular, the building of dikes in a riverbed that resulted in erosion causing damage to the plaintiffs' adjacent lands -- "was all authorized and directed by the Government of the

- 20 -

United States."  Id. (emphasis added).  And, the Court noted further that "[i]t is also conceded that the work thus authorized and directed was performed pursuant" to an Act of Congress.  Id.

It was only after the Court had given this rather detailed account of the travel of the case that the Court set forth the doctrine for which Yearsley is now known, stating that "[i]n that view, it is clear that, if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for exercising its will."  Id. at 20-21 (emphasis added).  The Court cited to three of its prior precedents to support that proposition.  See id. at 21 (citing Den ex dem. Murray's Lessee v. Hoboken Land & Imp. Co., 18 How. 272, 283 (1855); Lamar v. Browne, 92 U.S. 187, 199 (1875); and United States v. The Paquete Habana, 189 U.S. 453, 465 (1903)).  And, in elaborating on the protection that was being recognized, the Court further stated that "[w]here an agent or officer of the Government purporting to act on its behalf has been held to be liable for his conduct causing injury to another, the ground of liability has been found to be either that he exceeded his authority or that it was not validly conferred."  Id.  As support for this proposition, the Court then cited other of its prior precedents, all but the last of which concerned only the "validly conferred" issue.  See id. (citing Philadelphia Co. v. Stimson, 223 U.S. 605, 619 (1912);

- 21 -

United States v. Lee, 106 U.S. 196, 220 (1882); Noble v. Union River Logging R.R. Co., 147 U.S. 165, 171-72 (1893); Tindal v. Wesley, 167 U.S. 204, 222 (1897); Scranton v. Wheeler, 179 U.S. 141, 152 (1900); and Am. Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 108 (1902)).

Notably, the remainder of the Court's analysis addressed only the landowners' separate assertion that the private company was not entitled to protection from liability even for acting as the Government had "authorized and directed" because any such Government "authority" had not been "validly conferred." Id. at 21-23. The landowners had contended that was so because the private company's work in constructing the dikes had, by causing the river to erode the landowners' property, effected a "taking" without "just compensation" in violation of the Fifth Amendment of the U.S. Constitution, which the Government had no power under the Constitution to authorize. Id. But, the Court disposed of that issue solely by concluding that any such contention had to be brought in the Court of Claims and so was not properly before the Supreme Court on appeal. Id. at 23.

As this review of Yearsley reveals, then, the Court had no reason to address in Yearsley itself when an "agent or officer" of the Government may be denied protection from liability on the ground that, even though the Government had "validly conferred" some authority on the "agent or officer[,]" such an "agent or

- 22 -

officer" "exceeded" its authority to act on behalf of the Government. Id. at 21. The Court instead proceeded on the understanding that the Government contractor there faced liability solely for the work that it had been "authorized and directed" to undertake; after all, the only damage that the Government contractor's work was alleged to have caused had been found to have been the "inevitable" consequence of the Government contractor having performed that very work under the direction of the Secretary of War and the supervision of the Chief of Engineers of the United States. Id. at 19-20 (emphasis added).

Thus, while Yearsley recognizes that an "agent or officer" may enjoy protection from liability when "authorized and directed" by the Government to take the action for which it is alleged to be liable, Yearsley does not hold that an "agent or officer" necessarily also enjoys protection from liability for not taking other actions that the Government left it free to take while acting as it had been so "authorized and directed."

We emphasize, too, that we do not understand Yearsley to be implicitly suggesting otherwise, given the Supreme Court's instruction that "an instrumentality of Government [one] might be and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts." Sloan Shipyards Corp. v. U.S. Shipping Bd. Emergency Fleet Corp., 258 U.S. 549, 567 (1922). Indeed, in the wake of Yearsley, the Court emphasized

that the "liability of an agent for his own negligence has long been embedded in the law." Brady v. Roosevelt S.S. Co., 317 U.S. 575, 580 (1943).

We do recognize that the Supreme Court rejected a claim of Yearsley protection by a Government contractor in Campbell-Ewald Co. v. Gomez on the ground that such protection is not available to a party alleged to be liable for having acted in violation of the Government's "explicit instructions." 577 U.S. 153, 166 (2016). But, in so holding, the Court at no point suggested that Government agents or officers are entitled to protection under Yearsley so long as they are not acting in violation of such instructions. See id. And, of course, any such notion would be implausible, given that Government agents and officers may do all manner of things that are not in violation of any express instructions of the Government but that have in no sense been "authorized and directed" by the Government.

We add, in this regard, that our Circuit has not had occasion to decide when conduct that is alleged to engender liability has been "authorized and directed" by the Government for purposes of Yearsley and so is not conduct that "exceeded" authority that the Government "validly conferred." But, other circuits have. And, they have not read Yearsley differently from how we read Yearsley here. See Cabalce v. Thomas Blanchard & Assocs., Inc., 797 F.3d 720, 732 (9th Cir. 2015) (holding that the

- 24 -

protection that Yearsley provides is "limited to cases in which a contractor 'had no discretion in the design process and completely followed government specifications.'" (quoting In re Hanford Nuclear Rsrv. Litig., 534 F.3d 986, 1001 (9th Cir. 2008))); see also In re U.S. Office of Personnel Mgmt. Data Sec. Breach, 928 F.3d 42, 69-70 (D.C. Cir. 2019) (holding that the contractor could not "wrap itself in" Yearsley protection because it had not established that it had been "authorized and directed" by the government "to design its system with the security flaws that [the plaintiffs] identif[ied]"); In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 345 (4th Cir. 2014) ("[S]taying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities 'act[s] of the government' [sufficient to trigger Yearsley protection]." (alteration in original)). Or, at least, they have understood Yearsley's protection to extend at most to cases in which the allegedly liability-causing action (or inaction) of the private party claiming that protection was specifically "approved" by the Government in advance of that action having been taken to accomplish the task that the Government did "authorize and direct" that private party to perform. See Taylor Energy Co. v. Luttrell, 3 F.4th 172, 177 (5th Cir. 2021).

**D.**

Against this legal backdrop, Cultural Care asserts that it enjoys protection under Yearsley because the plaintiffs-appellees' claims at issue seek to hold the company liable for merely "stepping into the State Department's shoes and 'perform[ing] exactly as' the government 'directed.'" See Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 647 (4th Cir. 2018). We thus need to determine whether Cultural Care has made that showing. To do so, we must address the contentions that Cultural Care makes with respect to not only the plaintiffs-appellees' federal and state wage-and-hour claims but also their deceptive trade practices claims.

**1.**

With respect to the plaintiffs-appellees' federal and state wage-and-hour claims, Cultural Care contends that the plaintiffs-appellees seek to hold it "liable as an employer for supposed wage-and-hour violations" because it told host families that the minimum weekly "stipend" for au pairs is "$195.75" and "it screens, trains, monitors, and maintains certain records for au pairs." More specifically, Cultural Care contends that the plaintiffs-appellees allege in this regard that Cultural Care "is their 'employer' and thus is liable for their host families' alleged violations of state and federal wage-and-hour laws" because Cultural Care "monitors au pairs' welfare; has 'the right

to reject any au pair application'; 'exercises control over the wages, hours and working conditions [of au pairs]'; 'maintains [] records regarding' au pairs; 'requires all its au pairs to attend four days of training'; and 'instructs' host families to pay" a weekly "stipend," which it currently describes as a "weekly payment of $195.75."

Cultural Care appears to be contending, in other words, that the plaintiffs-appellees' wage-and-hour claims seek to hold the company liable for performing "exactly as directed" because those claims seek to hold it liable merely for taking actions that DOS regulations and guidance documents required it to take as a "sponsor." See 22 C.F.R. §§ 62.10, 62.31(c)-(i). But, even if we were to assume that the relevant DOS regulations and guidance documents did "require . . . Cultural Care to perform" any or even all the actions that we have just described, we cannot agree with Cultural Care's contention.

The DOS regulations and guidance documents referenced above do not purport to prevent Cultural Care from taking actions that would have brought the company into compliance with what the plaintiffs-appellees alleged the relevant wage-and-hour laws require. For example, those regulations and guidance documents do not purport to prevent Cultural Care from taking actions to ensure that the au pairs received the wages that they claim had to be paid to them under the relevant wage-and-hour laws. Thus, this is

- 27 -

not a case like <u>Cunningham</u> in which the Fourth Circuit held that <u>Yearsley</u> protected a private party expressly authorized and directed by the Government to violate the liability-engendering laws that it was alleged to have violated.  <u>See</u> 888 F.3d at 647; <u>cf.</u> <u>In re World Trade Ctr. Disaster Site Litig.</u>, 521 F.3d 169, 196-97 (2d Cir. 2008) (finding -- in applying in the "Stafford Act context" the protection recognized in <u>Boyle</u> v. <u>United Techs. Corp.</u>, 487 U.S. 500 (1988) -- that such protection "refined" the protection granted in <u>Yearsley</u> and "will not preclude recovery for injuries occasioned by violation of state statutes if the entity could have abided by those statutes while implementing the agency's specifications").  Accordingly, it is hard to see how we could conclude -- at least at this stage of the litigation -- that the plaintiffs-appellees seek to hold Cultural Care liable merely for acting as the regulations and guidance documents required.

Moreover, <u>Yearsley</u> does not establish that a private party is protected from liability for its actions so long as it was "authorized and directed" by the Government to act in ways that suffice only to bring it within the class of parties -- here, "employers" -- that are subject to the laws on which the plaintiffs' claims are premised.  <u>Yearsley</u> protects parties from liability for acting in a way that gives rise to liability because so acting is unlawful.  Cultural Care develops no argument -- and

- 28 -

identifies no precedent to suggest -- that <u>Yearsley</u> indicates otherwise.

To be sure, Cultural Care does contend that DOS regulations and guidance documents provided that a "sponsor" "need only '[e]nforce and monitor [the] host family's compliance with [the State Department's] stipend and hours requirement,'" citing 22 C.F.R. § 52.31(n). And, for that reason, Cultural Care contends that the regulations and guidance documents "directed and <u>certainly authorize[d]</u>" it to act as it did -- in other words, to do only what it did and no more. (Emphasis added.)

But, insofar as Cultural Care means to shift from a contention that the plaintiffs-appellees' federal and state wage-and-hour claims seek to hold Cultural Care liable only for doing what it was "directed to do" to a contention that those claims seek to hold it liable for merely doing what it was "certainly authorized" to do, Cultural Care does not explain how the latter showing can in and of itself suffice to trigger protection under <u>Yearsley</u>. <u>See</u> <u>Yearsley</u>, 309 U.S. at 20. Moreover, even if an entity need do no more than Cultural Care did to meet the requirements of being a "sponsor," the regulations and guidance documents that set forth the requirements do not purport to bar such an entity from taking actions that (according to the plaintiffs-appellees) would have brought Cultural Care into compliance with the laws that underlie plaintiffs-appellees'

- 29 -

claims.  Indeed, as we explained in Capron v. Office of Attorney General of Massachusetts, the text of the regulations that govern the "exchange visitor program" make it "hard to draw" the "inference" that the regulations prohibit au pairs from being paid above the minimum amount required in the regulations.  944 F.3d 9, 29-30 (1st Cir. 2019); see 22 C.F.R. § 62.31(j).

Thus, Cultural Care at most has shown that a decision not to take the actions that the plaintiffs-appellees alleged would have brought it into compliance with the state and federal laws at issue was a decision that it could make without thereby failing to comply with the DOS regulations and guidance documents.  Cultural Care develops no argument that in deciding not to comply with state and federal wage-and-hour laws it would have been acting as it had been "directed" to do.  Nor does Cultural Care even develop an argument that any such decision not to comply was itself approved (rather than not prohibited) by the Government in supervising its actions as a "sponsor."  See Taylor Energy Co., 3 F.4th at 175-76.

Of course, Cultural Care does argue that the plaintiffs-appellees' state wage-and-hour claims are preempted by the DOS regulations.  But, Cultural Care rightly recognizes that the question of whether it has been "authorized and directed" by the Government for purposes of Yearsley is distinct from the question of whether it enjoys protection from liability based on preemption.

- 30 -

Thus, we do not see how Cultural Care's arguments regarding preemption suffice to show that it is entitled to protection under Yearsley on the ground that the federal and state wage-and-hour claims seek to hold it liable only for doing what the Government "authorized and directed" it to do.

## 2.

With respect to the plaintiffs-appellees' claims that Cultural Care violated deceptive trade practices laws, our reasoning is similar. Cultural Care contends in its briefing to us that DOS guidance documents and binding regulations state that "[s]ponsors shall require that au pair participants," 22 C.F.R. § 62.31(j), receive a weekly stipend "directly connected to the federal minimum wage" of at least "$195.75." Cultural Care further contends that DOS, in part via "Federal Minimum Wage Increase" "Notice" guidance documents issued by the Department, directed Cultural Care to inform host families that the minimum "weekly stipend" is "$195.75." Cultural Care then asserts that these directives, per Yearsley, protect it from the plaintiffs-appellees' claims that Cultural Care violated deceptive trade practices laws. Cultural Care contends that these regulations and guidance documents do so by giving "materially misleading" instructions to host families that the minimum weekly "stipend" for au pairs is "$195.75," which the plaintiffs-appellees contend "deceiv[ed] au pairs and host families by claiming it is legal to

pay an au pair $195.75 per week for up to 45 hours of work" in select states where such payments are allegedly illegal.

But, the DOS regulations and guidance documents on which Cultural Care relies show only that the company was required as a "sponsor" to make sure that host families were informed of a minimum amount that they were required to pay. The regulations and guidance documents do not show that the Government directed Cultural Care as a "sponsor" to suggest to host families that they need compensate au pairs with only this amount to comply with federal and state wage-and-hour laws. See Capron, 944 F.3d at 29-30. Nor does Cultural Care identify any basis for our concluding at this stage of the litigation that, in directing Cultural Care's conduct as a "sponsor," the DOS specifically approved Cultural Care so suggesting. Indeed, Cultural Care develops no argument to us -- and, at the motion to dismiss stage, we do not see how we can conclude based on the DOS regulations and guidance documents, as written -- that the government "authorized and directed" Cultural Care to do such a thing.

Cultural Care does assert that it is entitled to Yearsley protection from plaintiffs-appellees' deceptive trade practices claims because the DOS regulations required the company to provide DOS with "[a] complete set of all promotional materials, brochures, or pamphlets distributed to either host family or au pair participants," which DOS reviewed for federal compliance every

- 32 -

year.  22 C.F.R. § 62.31(m)(4), (6).  But, Cultural Care does not contend that the DOS review process barred it from providing information to host families that would have informed them of what wage-and-hour laws would have required host families to pay (insofar as those laws would have required a higher payment than the minimum that the DOS regulations and guidance documents required Cultural Care to describe).  We thus do not see how these DOS regulations support Cultural Care's claim of protection under Yearsley as to the plaintiffs-appellees' deceptive trade practices claims.  See Cunningham, 888 F.3d at 647; cf. In re World Trade Ctr. Disaster Site Litig., 521 F.3d at 196-97 (explaining, in applying in the "Stafford Act context" the protection recognized in Boyle, 487 U.S. 500, that such protection "refined" the protection granted in Yearsley and that, "if the government merely accepted, without substantive review or enforcement authority, decisions made by an entity, that entity would not be entitled" to Boyle protection).

Finally, as we noted above, neither Campbell-Ewald, see 577 U.S. at 166, nor Cultural Care's assertions of the separate defense of preemption have any bearing on the question that is critical here -- namely, whether Cultural Care was "authorized and directed" by the Government to act in the ways for which plaintiffs-appellees seek to hold it liable.  Thus, just as we conclude that Cultural Care has not shown that it is entitled to

- 33 -

Yearsley protection from the plaintiffs-appellees' federal and state wage-and-hour claims, we conclude that the same is true with respect to the plaintiffs-appellees' deceptive trade practices claims.

## E.

In sum, Cultural Care has not shown, at least at this stage of the litigation, that it is entitled to protection under Yearsley, because it has not shown that any of the plaintiffs-appellees' claims at issue in this appeal seek to hold it liable for taking actions that the Government "authorized and directed." Yearsley, 309 U.S. at 20. Accordingly, we need not -- and do not -- decide in this appeal either whether Yearsley recognizes an immunity from suit rather than merely a defense to liability or whether a party, to be entitled to the protection that Yearsley recognizes, must have a contractual or common-law agency relationship with the Government. And that is because we reject Cultural Care's challenge to the District Court's order denying its motion to dismiss based on Yearsley for the separate reasons that we have just given.

## III.

There remains Cultural Care's contention that we have pendent appellate jurisdiction to address whether the state law wage-and-hour and deceptive trade practices claims brought by plaintiffs-appellees are preempted and whether Cultural Care is an

- 34 -

"employer" under the FLSA. For this to be the case, these issues must be "inextricably intertwined" with or "necessary to ensure meaningful review" of some other issue over which we have appellate jurisdiction. Swint, 514 U.S. at 51.

The parties do not address whether we would lack pendent appellate jurisdiction over the remaining portions of Cultural Care's appeal if we were to lack appellate jurisdiction under the collateral order doctrine over Cultural Care's appeal from the order denying its Yearsley-based claim of immunity. But here, too, we need not concern ourselves with a fine point of appellate jurisdiction. And that is because, as we will explain, we conclude that we have no basis for exercising pendent appellate jurisdiction over these remaining portions of Cultural Care's appeal in any event. Thus, we conclude that we must dismiss these portions of Cultural Care's appeal even assuming, as we do, that we have appellate jurisdiction under the collateral order doctrine over the Yearsley-based portion of its appeal. See Norton, 427 U.S. at 531-32; Cowels, 936 F.3d at 67.

**A.**

In urging us to exercise pendent appellate jurisdiction here, Cultural Care contends that we have such jurisdiction over the portion of its appeal that takes aim at the order denying its motion to dismiss on the ground that it is not an "employer" under the FLSA. That is so, Cultural Care contends, because the issue

- 35 -

of whether it is an "employer" under the statute is "inextricably intertwined" with the issue of whether Cultural Care is entitled to immunity under Yearsley.

Cultural Care reasons in this regard as follows. It asserts that if it were immune from suit based on Yearsley, then the FLSA would waive that immunity if Cultural Care were an "employer" under FLSA. See 29 U.S.C. § 216(b). Thus, Cultural contends, we then would have to decide whether Cultural Care was an "employer" under the FLSA to resolve whether it was entitled to the claimed immunity.

But, as we have explained, we have concluded that Cultural Care has not shown that it is entitled to immunity under Yearsley solely because we have concluded that Cultural Care has not shown at this stage of the proceedings that it is entitled to Yearsley protection at all. And, in concluding on that basis that Cultural Care was not entitled to protection under Yearsley, we had no occasion to determine whether Cultural Care is an "employer" under the FLSA. Accordingly, we see no basis for exercising pendent appellate jurisdiction over the portion of Cultural Care's appeal in which it contends that it is not an "employer" under the FLSA.

**B.**

That leaves Cultural Care's contention that we have pendent appellate jurisdiction over the portion of its appeal in

which it challenges the District Court's order denying its motion to dismiss insofar as that motion is based on the contention that the plaintiffs-appellees' state law wage-and-hour and deceptive trade practices claims are preempted. But, here, too, Cultural Care has not shown that the issues that this portion of its appeal raises are "inextricably intertwined" with the issues that the Yearsley-based portion of its appeal raises.

As we have explained, the Yearsley-based portion of the appeal fails on the ground that Cultural Care has not shown that any of the state law wage-and-hour and deceptive trade practices claims at issue on appeal seek to hold it liable merely for following the DOS regulations and guidance documents. The state wage-and-hour claims, we have explained, instead seek to hold Cultural Care liable for not taking actions as an "employer" that it retained the discretion to undertake even if it were to follow the regulations and guidance. And, as we have explained, the deceptive trade practice claims are not relevantly different in that regard.

That is significant because Cultural Care does not, in the preemption-based portion of this appeal, suggest that it lacks discretion under the assertedly preemptive DOS regulations -- or any other requirement imposed by federal law on it as a "sponsor" -- to take the actions that the plaintiffs-appellees allege would have protected it from liability under their state law wage-and-

hour and deceptive trade practices claims.  See also Capron, 944 F.3d at 29-30.  Moreover, in concluding that Yearsley does not apply because Cultural Care has not shown that these claims seek to hold it liable for acting as "authorized and directed" by the Government, we have no occasion to address the many distinct issues that would be presented by the separate question of whether federal law displaces these state law claims even though federal law does not bar the exercise of discretion by Cultural Care that would permit it to be in compliance with the various state laws that underlie the claims at issue.

Thus, we conclude that the preemption-based portion of Cultural Care's appeal is not inextricably intertwined with the Yearsley-based portion.  Accordingly, we decline to exercise our discretion to assert pendent appellate jurisdiction over the preemption-based portion of this appeal.  See Limone v. Condon, 372 F.3d 39, 51-52 (1st Cir. 2004).

**IV.**

We therefore **affirm** the District Court's denial of Cultural Care's motion to dismiss on the ground that Cultural Care is not entitled to protection under Yearsley at this stage of the litigation, and we **dismiss** the remainder of Cultural Care's appeal for lack of appellate jurisdiction.